UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, for the use and benefit of BILLD EXCHANGE, LLC, a Delaware limited liability company,<br><br>                 Plaintiff,<br><br>vs.<br><br>BEST CHOICE CONSTRUCTION, LLC, a North Dakota limited liability company, and UNITED STATES FIRE INSURANCE COMPANY, a Delaware corporation,<br><br>                 Defendants. | 5:22-CV-05001-KES<br>5:21-CV-05042-KES<br><br><br>ORDER DENYING PARTIAL SUMMARY JUDGMENT |

Plaintiff, Billd Exchange, LLC (Billd) moves for partial summary judgment against defendants Best Choice Construction, LLC (Best Choice) and United States Fire Insurance Company (USF) on its claims under the Miller Act and quantum meruit assigned to Billd by Vertex Roofing, LLC (Vertex). Docket 47. Defendant USF opposes the motion. Docket 65. Defendant Best Choice did not respond.

**BACKGROUND**

**I.   Factual Background**

This matter arises from a project by the Bureau of Indian Affairs (BIA) to replace the roof at the Oglala Adult Offenders Facility at Pine Ridge, South Dakota. *See* Docket 49 ¶¶ 1-2; *see* Docket 66 ¶ 1. The BIA contracted with Best

Choice to replace the roof. Docket 49 ¶ 1; *see* Docket 66 ¶ 1. Per the BIA Solicitation, Best Choice was required to furnish a payment bond, also called a Miller Act Bond. *See* Docket 50-2 at 3, 26. On April 16, 2020 Best Choice executed the Miller Act Bond with its surety, USF, for $1,324,62.20. Docket 49 ¶ 4; Docket 66 ¶ 1.

On April 10, 2020, Best Choice entered into a subcontract with Vertex for Vertex to provide work, equipment, and materials for the roof replacement at the Oglala Adult Offenders Facility. Docket 50-1 at 3. The contract specifies that Vertex was to remove the existing roof and install a new roof. *See id.* at 1-3. On April 20, 2020, Vertex visited the project site and took core samples of the existing roof. Docket 49 ¶ 9; Docket 66 ¶ 3 (not disputing visit and collection of samples). Vertex estimated that the roof replacement project would take 37 days to complete. *See* Docket 50 ¶ 10; Docket 50-5.

On June 10, 2020, Vertex's crew arrived at the project site to begin work. Docket 50 ¶ 11. Shortly after arriving on June 10, Vertex's crew discovered a coat of asphalt on the existing roof deck. Docket 49 ¶ 12; Docket 66 ¶ 5 (objecting to description of asphalt coat, but not to its discovery). Duro-Last, the manufacturer of the replacement roof, then performed an adhered pull test on the asphalt on the roof "to show the bonding capacity of the Board-Max insulation adhesive to the existing asphalt." Docket 50-7 at 2. The results of the test indicated "an average resistance of 790 psf." *Id.* In a June 17, 2020 letter, Duro-Last remarked that "[t]his far exceeds the FM 1-90 minimum

requirement for the field of the roof, and the enhanced values that are required for the perimeter and corner areas of the roof." *Id.*

On June 19, 2020, Ed Green, president and CEO of Vertex, sent Ryan Dalbec, president and CEO of Best Choice, a text that stated they were "in a pickle" regarding the roof. Docket 50-8 at 1. Green also sent Dalbec two pictures of the roof conditions. *Id.* at 1-2. Dalbec replied "shit." *Id.* On June 22, 2020, Green again sent Dalbec a text, this time inquiring about a change order. *Id.* at 3. Dalbec replied that the BIA "won't accept a change order if the request isn't accepted[.]" *Id.*; Docket 49 ¶ 18; *But see* Docket 66 ¶ 11.

On June 24, 2020, Green asked Dalbec if he "had a discussion with the client mentioning a changed condition that's the reason [Vertex is] having a problem in the field." Docket 50-8 at 4. Dalbec later replied "not until the payment gets approved" which "should be today." *Id.* That same day, Dalbec asked Green to draft a proposed request for equitable adjustment that the two would review together. Docket 49 ¶ 23; *see generally* Docket 66. The next day, June 25, 2020, Green sent a draft of the requested document to Dalbec. *See* Docket 50-9; Docket 50-8 at 5.

Because all communication with the BIA was required to be through Best Choice, only Dalbec could send the request for equitable adjustment to the BIA. Docket 49 ¶ 26; *see* Docket 66 ¶ 1; *see also* Docket 50-10 at 1. On June 29, 2020, Green asked Dalbec if Dalbec had sent the report to the BIA. Docket 50-8 at 5. Dalbec did not directly answer, but requested that Green send him the report again. *Id.*

3

On August 17, 2020, Green again sent Dalbec a text to inform him of additional laborers who had been hired on the project. Docket 50-8 at 6. Dalbec responded that he was "working as hard as [he] can to get [the adjustment] pushed through" but that "[n]o one answers the phones there[.]" *Id.*; *see also* Docket 49 ¶ 29; Docket 66 ¶ 12 (not contesting that message refers to adjustment). The next day, Green asked Dalbec if the BIA had responded to the request for equitable adjustment. Docket 50-8 at 6-7. Dalbec said, "[y]es[,] they said they are working on it[.]" *Id.* at 7. On August 23, 2020, Dalbec again confirmed that he had sent the request for equitable adjustment "off for review." *Id.* at 8.

Throughout September, Green twice again asked Dalbec about updates on the adjustment. *Id.* at 9-10. Dalbec stated that he was "[w]orking on it." *Id.* at 10. On October 26, 2020, Green sent Dalbec an updated request for equitable adjustment with updated payment figures and other attachments. *See* Docket 50-12; *see also* Docket 49 ¶ 35; Docket 66.

On November 16, 2020, during a conference call between Green, Dalbec, and the BIA, Green learned for the first time that Dalbec had not sent any request for equitable adjustment to the BIA on Vertex's behalf. Docket 50 ¶ 29; *see also* Docket 49 ¶ 38; Docket 66. Green confronted Dalbec about their previous conversations regarding the adjustment request; Dalbec responded that he could not find any emails from either himself or Green to the BIA about the request. Docket 50-8 at 11-13. Green reminded Dalbec that only Dalbec was authorized to contact the BIA directly. *Id.* at 13-14.

Green also recorded a phone call between himself and Dalbec following the conference call. Docket 49 ¶ 42; Docket 66. Dalbec stated on the call that he could not find any emails to the BIA requesting an equitable adjustment on Vertex's behalf. Docket 49 ¶ 42; Docket 66. He also suggested that Green may need to "get legal involved" to resolve the situation and said that Green had good documentation to support its request for an equitable adjustment. Docket 49 ¶ 42; Docket 66. Dalbec reassured Green that he would take care of the situation and that Green should not panic. Docket 49 ¶ 42; Docket 66.

That same day, Green asked Dalbec by text message "[w]hat's the game plan if the [BIA] ignores any and all requests for equitable adjustment[.]" Docket 50-8 at 15. Dalbec said "[l]itigation." *Id.* at 16. Again on November 17, 2020, Green asked about the equitable adjustment and Dalbec stated that he could not reach the BIA representative. *Id.* at 17. Dalbec did not respond to similar requests on November 18 or 19, 2020. *Id.* at 17-18. On November 21, 2020, Green again asked Dalbec what to do if the BIA denied an equitable adjustment and Dalbec again responded "litigation." *Id.* at 21.

Vertex ultimately worked 223 days beyond what was initially contemplated by the contract before Vertex was directed to vacate the project site. *See* Docket 50 ¶ 24.

II.  **Procedural Background**

This matter originates with a complaint filed by Vertex in the Southern District of Texas in the case *Vertex Roofing, LLC v. Best Choice Construction LLC*, located at 22-cv-5001. In the complaint, Vertex alleges breach of contract

5

against Best Choice and USF or, in the alternative, quantum meruit. Case No. 22-cv-5001, Docket 1. Under either theory of liability, Vertex asserts a right to recover governed by the Miller Act, which is a federal statute. *Id.* Thus, this case is before the court on federal question jurisdiction, with the court exercising its supplemental jurisdiction to hear the related state-law contract and quantum meruit claims. *See* Case No. 22-cv-5001, Docket 1 ¶ 4; 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related . . . that they form part of the same case or controversy.").

On January 4, 2022, the case was transferred from the Southern District of Texas to the District of South Dakota by agreement of the parties. *See* Case No. 22-cv-5001, Dockets 21, 22. On an unknown date, Vertex assigned its claims to Billd. Docket 39 at 1-2. On August 16, 2022, the court granted Billd's motion to consolidate case No. 22-cv-5001 with the above-captioned matter. Docket 36. On October 07, 2022, the court granted Billd's subsequent motion to substitute itself for Vertex. Docket 45.

Billd moves for partial summary judgment on Vertex's quantum meruit claim. Docket 47. Defendant USF opposes the motion. Docket 65. Defendant Best Choice did not respond to Billd's motion for partial summary judgment; in USF's statement of undisputed material facts, USF asserts that Best Choice was not served with a complaint regarding Vertex's claim. Docket 67 ¶ 28. Billd does not argue that Best Choice was served the Vertex complaint. *See* Docket 69 at 1, n.2. But Billd argues that the motion for summary judgment can

proceed because Best Choice is not a necessary party because the Miller Act permits recovery against the payment bond, which does not require the involvement of the primary contractor. *See id.*; 40 U.S.C. § 3133(b)(10) ("Every person that has furnished labor or material . . . and that has not been paid in full . . . may bring a civil action *on the payment bond* for the amount unpaid[.]") (emphasis added). USF does not address whether Best Choice is a required party. *See* Docket 65.

Under Federal Rule of Civil Procedure 19(a)(a), a required party is one whose absence leaves the court unable to "accord complete relief among existing parties" or one who has claimed an interest in the litigation and whose absence "may as a practical matter impair or impede the person's ability to protect the interest[,] or leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." (section numbers omitted). If a party is found to be required, then the court "must order that the person be made a party," unless joinder is not feasible, in which case a judgment may be rendered in the person's absence, or the case may be dismissed. Fed. R. Civ. P. 19(a)(2), (b).

Nothing in the record indicates that Vertex has claimed an interest in the litigation. Rather, Vertex has not responded to the litigation, despite being represented by the same counsel as USF and despite being a named defendant to claims made by Billd in the consolidated case. *See* Docket 1. Thus, the only question is whether the court can "accord complete relief among existing parties" absent Vertex's joinder. *See* Fed. R. Civ. P. 19(a)(1)(A). A number of

district and circuit courts have considered whether a contractor is a required party to a Miller Act suit, and "all courts to consider the question have concluded that a surety alone may be sued by a subcontractor under the Miller Act." *United States ex rel. Henderson v. Nucon Constr. Corp.*, 49 F.3d 1421, 1423 (9th Cir. 1995) (collecting cases). As the Ninth Circuit explained, "[t]he words 'sue on such payment bond' are unambiguous" and do not require joinder of the contractor. *Id.* This court adopts the reasoning of the Ninth Circuit and joins the majority of courts that have considered this question in finding that a contractor is not a required party to a Miller Act claim against a surety. The analysis thus proceeds with the remaining parties, Billd and USF.

## DISCUSSION

### I. Summary Judgment Standard

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A fact is 'material' if it may 'affect the outcome of the suit.'" *Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1048 (8th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In ruling on a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party." *Van Dorn v. Hunter*, 919 F.3d 541, 544 (8th Cir. 2019) (quoting *Leonetti's Frozen Foods, Inc. v. Rew Mktg.*, 887 F.3d 438, 442 (8th Cir. 2018). But, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the [factfinder] could reasonably

8

find for the [non-moving party.]" *Turner v. XTO Energy, Inc.*, 989 F.3d 625, 627 (8th Cir. 2021) (second alteration in original) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 252).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citation omitted).

### II.   The Miller Act

Under the Miller Act, "[b]efore any contract of more than $100,00 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government" certain bonds. 40 U.S.C. § 3131(b). Though "[o]rdinarily, a supplier of labor or materials on a private construction project can secure a mechanic's lien against the improved property under state law[,]" "a lien cannot attach to Government property[,]" thus depriving subcontractors of their usual security interest. *F.D. Rich Co., Inc. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 122 (1974). Congress enacted the Miller Act to remedy this insecurity and to protect the interests of subcontractors on government projects. *Id.* In relevant part, the Miller Act provides that:

> Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the

> last labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment bond for the amount unpaid at the time the civil action is brought . . .

40 U.S.C. § 3133(b)(1). "The Act is to be construed broadly because of its remedial nature." *Consol. Elec. & Mechs., Inc. v. Biggs Gen. Contracting, Inc.*, 167 F.3d 432, 434 (8th Cir. 1999).

Here, the parties do not dispute the existence of a Miller Act Bond; nor do they disagree that Vertex "furnished labor or materials." *See* Dockets 48, 65. Rather, the dispute concerns whether any amount owed to Vertex remains "unpaid." Billd argues that Vertex performed work outside the scope of the contract and quantum meruit entitles Vertex to payment for those unpaid services. Docket 48 at 11. USF contends that Vertex only performed work governed by the contract and is not entitled to any further recovery. Docket 65 at 4. Because recovery under the Miller Act depends on the validity of the underlying state-law claim, the court next considers the merits of that claim.

### III. Quantum Meruit Claim

#### A. Legal Standard

Quantum meruit claims are a matter of state law. In this case, the claim is before the court on supplemental jurisdiction. "A federal court exercising supplemental jurisdiction over state law claims in a federal question lawsuit must follow the choice-of-law rules of the forum state." *Am. Online, Inc. v. Nat'l Health Care Discount, Inc.*, 121 F. Supp. 2d 1255, 1268 (N.D. Iowa 2000) (collecting cases). Thus, the elements of the claim will be determined by which state's law applies under South Dakota choice-of-law principles.

10

Though neither party provides a full discussion of the choice of law question, both parties agree that either Texas or South Dakota state law should govern. *See* Docket 48 at 12; Docket 65 at 8-9. Texas law may apply because it is the law chosen by the parties in their contract, and because the case was originally filed in Texas before being transferred to South Dakota due to concerns about venue. But because quantum meruit claims are not governed by an explicit contract and because the conduct at issue took place in South Dakota, South Dakota law may instead govern.

Under Texas state law,

> [A] party may recover under quantum meruit only where there is no express contract covering the services or materials furnished. To recover under quantum meruit, a claimant must prove that: (1) valuable services were rendered or materials furnished, (2) to the person sought to be charged, (3) which services or materials were accepted, used and enjoyed by that person, (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, was expecting to be paid by him.

*Ramsland v. WFW Family, LP*, 2018 WL 1790080, *10 (Tex. App. Apr. 16, 2018) (internal citations and quotations omitted).

Under South Dakota state law, quantum meruit "contemplate[s] that no express agreement for compensation exists." *Blue v. Blue*, 916 N.W.2d 131, 136 (S.D. 2018). "Quantum meruit implies a contract where none exists and awards restitution for the value of the services provided under that implied contract." *Id. (quoting Johnson v. Larson*, 779 N.W.ed 412, 417 (S.D. 2010)). "Typically, when a person provides services or materials to another and those

11

services or materials are voluntarily accepted, it is inferred that the services or materials were given and received in the expectation of being paid for, and a promise to pay their reasonable worth implied." *Van De Walle & Assocs. L.L.C. v. Busemon*, 665 N.W.2d 84, 87 (S.D. 2003) (internal quotations omitted).

Though these two standards differently articulate the elements of quantum meruit claims, both confirm that the threshold inquiry is whether an express contract governs the conduct at issue. If such conduct is governed by an express contract, then the claim must fail. But if the conduct is outside the contract, then the claim can procced. Because the parties dispute whether the conduct at issue is governed by an express contract, the court first addresses whether the contract governs the conduct at issue before turning to the choice-of-law question.

### B. Discussion

Billd argues that the work that Vertex performed was outside of the contract scope because, in attempting to perform, Vertex discovered that a previously unknown and non-standard coat of asphalt was used on the existing roof and the removal of this coat was not contemplated in the original agreement. Docket 48 at 12-14. USF contends that there is no evidence that the existing roof was non-standard and that all work performed was required by the contract. Docket 65 at 4-8. USF alleges that the contract provides "tear off is down to the deck," and Billd has not demonstrated any reason that Vertex should have been exempted from that requirement. *Id.*

12

### 1. Contract requirements

Unlike the choice of law regarding the quantum meruit claim, the choice of law governing the interpretation of the contract is clear. Under the choice of law provision of the contract between Vertex and Best Choice, the "agreement shall be governed by and construed in accordance with the substantive laws of the state of Texas[.]" Docket 50-1 at 4. South Dakota law generally recognizes the enforceability of choice of law provisions in contracts, unless the provision would contravene South Dakota public policy. See *Dunes Hosp., L.L.C. v. Country Kitchen Int'l., Inc.*, 623 N.W.2d 484, 488 (S.D. 2001). Because the parties do not argue and the court does not independently find that the application of Texas law contravenes public policy, Texas state law controls interpretation of the contract.

"In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex. 2003). The court should thus "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). If the contract can be given a certain or definite legal meaning by the court, then the contract is not ambiguous and the court "will construe the contract as a matter of law." *Id.* If, however, the contract is "reasonably susceptible to more than one

13

meaning[,]" then it is ambiguous. *Id.* Whether a contract is ambiguous is a question of law for the court. *Id.* at 374. But if a contract is found to be ambiguous, then "the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Id.* at 394.

Two provisions are relevant to the construction of the contract. The first is a bullet point specifying that "tear off is down to the deck." Docket 50-1 at 3. The second is paragraph 3 of "provisions of contract" which specifies that: "Any alternation or deviation from the contract specifications will be performed only upon written change order resulting in an extra charge beyond the contract price. Alteration or deviation includes hidden damages that are uncovered during the course of the job and additional work." *Id.* at 4, ¶ 3.

USF argues that, because the contract requires tear down to the deck, Vertex was required to remove the existing roof, seemingly without regard to whether that roof conformed to industry standards. Docket 65 at 4-8. If the court were to accept USF's construction, however, the court would render meaningless the paragraph 3 hidden damages provision. Afterall, if no hidden damage to the existing roof could excuse Vertex from its obligations, then the clause would serve no function. Thus, the court finds that Vertex was required to remove the roof only on the condition that it not uncover hidden damages. Once hidden damages were uncovered, then Vertex would be required to perform only after the hidden damage was remedied or after the contract was altered to reflect the hidden damage.

14

Though USF further contends that the claim for quantum meruit must fail because there was no written alteration to the contract under paragraph 3 of "provisions of contract," the court also rejects this argument. USF is correct that there was no alteration to the contract, but a claim for quantum meruit does not require a contract alteration. Instead, it is an equitable claim for an independent implied contract. Thus, the claim does not fail for lack of written alteration under paragraph 3.

### 2. Whether the asphalt coat was industry standard

The question remains over whether there were hidden damages to the existing roof. USF argues that Billd has provided no evidence that the roof was not industry standard. Billd contests this assertion.

To demonstrate that the roof was not to industry standard, Billd points to a letter from Duro-Last summarizing the results of an "adhered pull test" that found "an average resistance of 790 psf[,]" a reading that "far exceeds the FM 1-90 minimum requirement[.]" Docket 50-7 at 2; Docket 48 at 3. Billd also submitted photographs of the roof, an affidavit from Green characterizing the asphalt as an "extensive flood coat" that is "not industry custom," and text message conversations between Green and Dalbec. Docket 50 ¶ 12-13; Dockets 50-6, 50-8. In the text conversations, Green opines that Vertex will need an adjustment to finish the work. Docket 50-8 at 3. Dalbec responds "shit" to photographs of the roof deck and requests that Green draft an adjustment request. *Id.* at 2, 4.

In response, USF submits an email from Green in which Green states that he needs "a crafty letter from [Duro-Last] certifying that removing asphalt from concrete is against industry standard[.]" Docket 68-2 at 1. Without a letter, Green worries that Vertex "will go bankrupt[.]" *Id.* USF also highlights the language of the Duro-Last letter, stating that it is "void of the use of the words 'flood' or 'excessive' "and that it does not specify the industry standard. Docket 65 at 6.

Neither party submits evidence of industry standards regarding asphalt application to roofs. *See* Dockets 50, 68 (not describing declarant's knowledge, skill, experience, training, or education); *see also* Fed. R. Evid. 702. Though a reasonable trier of fact could find that the roof is not to industry standards under the evidence presented by Billd, USF's arguments and evidence create a genuine question of material fact. Because such a question exists, summary judgment is denied.

### 3. Choice of law

Because summary judgment would be denied under either legal standard, the court need not decide the choice of law question and declines to do so at this time without briefing by the parties.

### CONCLUSION

Because a genuine dispute of material fact exists, it is

ORDERED that Billd's motion for partial summary judgment (Docket 47) is denied.

Dated May 30, 2023.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE